UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LOUIS STRAMAGLIA,                              )
VOLPE-VITO, INC.  d/b/a                        )        Civil Case No. 5:06-cv-13764
FOUR BEARS WATER PARK,                         )
a Michigan corporation,                        )
MILL CONTRACTORS & DEVELOPERS, INC., )          Hon.  John Corbett O'Meara
a Michigan corporation and                     )
MELTON ROAD DEVELOPMENT COMPANY, )              Referral Judge: Wallace Capel
a Michigan limited liability company           )
                                               )
          Plaintiffs,                          )
                                               )
vs.                                            )
                                               )
UNITED STATES OF AMERICA,                      )
                                               )
          Defendant.                           )
                                               )
_____)

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

For the reasons set forth in the Brief filed herewith, Plaintiffs move for summary

judgment pursuant to Fed. R. Civ. P. 56.

                              s/John A. Ruemenapp
                              Weisman, Young, Schloss & Ruemenapp, P.C.
                              30100 Telegraph Road, Suite 428
                              Bingham Farms, MI  48025
                              (248) 258-2700
                              (248) 258-8927
                              jruemenapp@wysr-law.com
                              (P34796)

Dated:  August 10, 2007

F:\CLIENTS\S\Stramaglia Louis 6246-\Tax Issues -6525\Pleadings\Plts' Motion for Summary Judgment.doc

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LOUIS STRAMAGLIA,                              )
VOLPE-VITO, INC.  d/b/a                         )          Civil Case No. 5:06-cv-13764
FOUR BEARS WATER PARK,                          )
a Michigan corporation,                         )
MILL CONTRACTORS & DEVELOPERS, INC.,  )          Hon.  John Corbett O'Meara
a Michigan corporation and                      )
MELTON ROAD DEVELOPMENT COMPANY,  )          Referral Judge: Wallace Capel
a Michigan limited liability company            )
                                                )
        Plaintiffs,                             )
                                                )
vs.                                             )
                                                )
UNITED STATES OF AMERICA,                       )
                                                )
        Defendant.                              )
                                                )
_____ )

## BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INDEX OF AUTHORITIES.............................................................................................. ii

INDEX OF EXHIBITS ................................................................................................... iv

STATEMENT OF ISSUES PRESENTED........................................................................ v

CONTROLLING OR MOST APPROPRIATE AUTHORITY FOR THE RELIEF SOUGHT... vi

INTRODUCTION ............................................................................................................1

STATEMENT OF FACTS ................................................................................................1

      A.      The Parties and Procedural Background .................................................... 1

      B.      Substantive Background ............................................................................ 2

              1.    Volpe-Vito ..................................................................................... 2

              2.    Flab ................................................................................................ 3

              3.    Auburn Park ................................................................................... 5

              4.    Mill.................................................................................................. 6

              5.    Melton ........................................................................................... 7

      C.      The Tax Liability ...................................................................................... 7

ARGUMENT..................................................................................................................10

    I.      THE TEST FOR SUMMARY JUDGMENT ....................................................... 10

    II.      THE THIRD PARTIES ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE THE CORPORATE VEIL OF THE TAXPAYERS MUST BE RESPECTED ................................................................................................... 11

      A.      The Taxpayers Are Not A Mere Instrumentality of The Third Parties..... 13

      B.      The Corporate Entities of  The Taxpayers Were Not Used To Commit A Fraud or Wrong.................................................................................... 16

CONCLUSION...............................................................................................................18

# INDEX OF AUTHORITIES

**Cases**

Bennett v. City of Eastpointe,
    410 F.3d 810 (6th Cir. 2005) ........................................................................... 10

Chrysler Corporation v. Ford Motor Company,
    972 F. Supp. 1097 (E.D. Mich., 1997)...................................................... 12, 16

City of Dearborn v. DLZ Corporation,
    111 F. Supp.2d 900 (E.D. Mich. 2000).................................................... 12, 16

Corrigan v. United States Steel Corporation,
    478 F.3d 718 (6th Cir., 2007) ............................................................................ 1

Foodland Distributors v. Al-Naimi,
    220 Mich. App. 453 (1996)............................................................................. 11

Gledhill v. Fisher & Co.,
    272 Mich. 353 (1935) .................................................................................... 12

Grass Lake All Seasons Resort Inc. v. United States,
    2005 2 U.S. Tax  Case (CCH) P. 50, 580; 2005 U.S. Dist. LEXIS 22448 (E.D. Mich,
    2005) ............................................................................................................. 14

Hopson v. DaimlerChrysler Corporation,
    306 F.3d 427 (6th Cir., 2002) ........................................................................ 10

Laborers' Pension Trust Fund v. Sidney Weinberger Homes, Inc.,
    872 F.2d 702 (6th Cir., 1988) ........................................................................ 11

Olympic Forest Products, Ltd. v. Cooper,
    148 Fed. Appx. 260; 2005 U.S. App. LEXIS 14854 (6th Cir., 2005) .............. 11

Pack v. Damon Corp.,
    434 F.3d 810 (6th Cir., 2006) ........................................................................ 10

PBV Inc. v. Rossetti,
    99-1 U.S. Tax Case (CCH) P. 50,490; 1999 U.S. App. LEXIS 6393 (6th Cir., 1999)...... 11

Precision, Inc. v. Kenco/Williams, Inc.,
    66 Fed. Appx 1; 2003 US App LEXIS 5740 (6th Cir., 2003) ..................................... 14, 15

Roger Miller Music, Inc. v. Sony/ATV Publishing, LLC,
    477 F.3d 383 (6th Cir., 2007) ........................................................................ 10

Seasword v. Hilti, Inc.,
       449 Mich. 542, 548 (1995) ............................................................................................ 12

U.S. Structures Incorporated v. J.P. Structures Incorporated,
       130 F.3d 1185 (6th Cir., 1997) .................................................................................... 10

## **Statutes**

Fed. R. Civ. P. 56 ............................................................................................................... 2

Fed. R. Civ. P. 56(c) .......................................................................................................... 8

## **Other Authorities**

26 U.S.C. §7426 .................................................................................................................. 2

26 U.S.C. §7433 .................................................................................................................. 2

28 U.S.C. §2410 .................................................................................................................. 2

28 U.S.C. §7426 .................................................................................................................. 2

**INDEX OF EXHIBITS**

1. Volpe-Vito Articles and Certificates

2. Volpe-Vito Redemption

3. Construction Documents

4. Volpe-Vito Corporate Documents

5. Volpe-Vito Financial Statements

6. Stramaglia Affidavit

7. Flab Corporate Documents

8. Flab Leases

9. Flab Liquor License

10. Flab Personal Property

11. Flab Financial Statements

12. Auburn Park Corporate Documents

13. Concession Agreement

14. Auburn Park Financial Documents

15. Mill Corporate Documents

16. Stramaglia Deposition Transcript p. 44-47

17. Volpe-Vito Written Consent

18. Melton Operating Agreement

19. Unreported Cases

20. Auburn Park Employee List

21. Flab Employee List

22. Excerpts from Volpe-Vito's General Ledger

## STATEMENT OF ISSUES PRESENTED

Are Plaintiffs entitled to summary judgment because no admissible evidence exists that suggests that they are the alter ego of Auburn Park Mng. Co. or Flab, Inc.?

## CONTROLLING OR MOST APPROPRIATE AUTHORITY
## FOR THE RELIEF SOUGHT

Fed. R. Civ. P. 56

Chrysler Corporation v. Ford Motor Company
        972 F. Supp. 1097 (E.D. Mich. 1997)

Precision, Inc. v. Kenco/Williams, Inc.,
        66 Fed. Appx 1; 2003 U.S. App. LEXIS 5740 (6th Cir., 2003)

Servo Kinetics, Inc. v. Tokyo Precision Instruments Co.
        475 F.3d 783 (6th Cir., 2007)

## INTRODUCTION

This case challenges the assertion of the IRS -- Plaintiffs' believe unsupported by any facts -- that the Plaintiffs are the alter ego[1] of two non-parties, Flab, Inc. and Auburn Park Mng. Company, and therefore are liable for their tax obligations.  As set forth in detail below, the IRS is unable to demonstrate, with proper admissible evidence, that there is a genuine issue of material fact concerning whether Plaintiffs are an alter ego.  Inasmuch as the IRS bears the burden of proof on this issue, Summary Judgment for Plaintiffs is proper.

## STATEMENT OF FACTS

**A.**     **The Parties and Procedural Background.**

There are four Plaintiffs in this case.  They are Louis Stramaglia ("Stramaglia"), Volpe-Vito, Inc. d/b/a Four Bears Water Park ("Volpe-Vito"), Mill Contractors & Developers, Inc. ("Mill") and Melton Road Development Company, LLC ("Melton").  Hereafter, for reasons which will become apparent, these four Plaintiffs are sometimes collectively referred to as the "Third Parties".

Between 1997 and 2002, the United States, by its agency the Department of Treasury -- Internal Revenue Service (the "IRS"), assessed employment taxes against Auburn Park Mng Co. ("Auburn Park") and Flab Inc., d/b/a Honey Bear Restaurant ("Flab").  Hereafter, Auburn Park and Flab are sometimes collectively referred to as the "Taxpayers".  For purposes of the present

---

[1]The cases and authority seem to use the terms/concepts of "piercing the corporate veil" and "alter ego" interchangeably.  See Corrigan v. United States Steel Corporation, 478 F.3d 718, 724 (6th Cir., 2007).  At the risk of confusion, for purposes of this discussion, Plaintiffs will also use these concepts to denote a single theory.

motion, the Third Parties do not dispute that the Taxpayers are liable to the IRS for assessments that approximate $150,000.00 plus statutory additions (the "Tax Liability).[2]

In 2006, the IRS recorded and/or served a series of tax liens and levies alleging that the Third Parties are the "nominee, transferee or alter ego" of the Taxpayers. The Third Parties responded by filing this case. The First Amended Complaint of the Third Parties states that they are not the nominee, transferee or alter ego of the Taxpayers and, therefore, are not liable to the IRS for any of the Tax Liability. The First Amended Complaint claims the IRS has committed a series of wrongful levies under 28 U.S.C. §7426 (Count I), seeks to quiet title to various property pursuant to 28 U.S.C. §2410 (Count II), seeks declaratory relief (Count III) and seeks damages pursuant to 26 U.S.C. §7426 and/or 26 U.S.C. §7433.

As set forth in more detail below, the Third Parties are entitled to summary judgment pursuant to Fed. R. Civ. P. 56 for the reason that they are not, as a matter of law, the nominee, transferee or alter ego of the Taxpayers. Indeed, except for the amount of damages in this matter, there is no genuine issue of material fact and the Third Parties are entitled to summary judgment.

**B.**     **Substantive Background.**

    **1.**     **Volpe-Vito.**

Volpe-Vito was formed in October of 1981.[3] (Exhibit 1). The original shareholders of Volpe-Vito were Dennis Dean, Donna Dean (his wife) and B&V Construction Company. At that time, B&V Construction was owned by Leo Volpe and Adele Volpe. (Exhibit 2).

---

[2]This amount represents the portion of certain employment taxes that were not the "trust fund" portion. The "trust fund" portion, totaling nearly $200,000 in tax, has been paid.

[3]At that time, it was known as Volpe-Dean, Inc.

In 1982, the shares of Dennis and Donna Dean were redeemed by Volpe-Vito and purchased from the corporation by Stramaglia and his brother, Frank E. Stramaglia ("Frank"). Each paid $150,000 and acquired 25% of the outstanding shares of Volpe-Vito. In 1987, Volpe-Vito redeemed the shares previously held by B&V Construction for $300,000. Id. That transaction left Stramaglia and Frank as the sole shareholders of Volpe-Vito -- each owning 50% of the outstanding shares.

Frank passed away in 1990. Sometimes later, Stramaglia became the sole shareholder of Volpe-Vito when he acquired the remaining 50% interest in Volpe-Vito.

Volpe-Vito owned substantial real estate on Auburn Road in Shelby Township, Michigan. The real estate included a small lake. During the mid 1980's, Volpe-Vito developed the real estate into a water park/recreation facility (sometimes the "Park"). Literally millions of dollars were spent to, among other things, build a building for a restaurant, banquet area, and office, develop a beach, build an amusement park and the like. (Exhibit 3).

Volpe-Vito followed proper corporate formalities and kept separate corporate documents since its formation. (Exhibits 1, 2 and 4). It has always maintained its own, separate bank accounts, prepared financial statements (Exhibit 5) and kept meticulous bookkeeping records. (Exhibit 6). Since the late 1990's Volpe-Vito's officers have been Stramaglia and Thomas Nepa, the "in-house" accountant who maintained the books for Volpe-Vito.

2. **Flab**.

Flab was incorporated in April of 1983 by its then sole shareholder, Frank. (Exhibit 7). Stramaglia was not -- and has never been -- a shareholder of Flab. Flab was established to build out and operate a restaurant at the Park in the building owned by Volpe-Vito. Flab entered into a lease with Volpe-Vito (Exhibit 8), acquired a liquor license in its own name (Exhibit 9) and

purchased and installed various restaurant equipment including assorted kitchen equipment, restaurant tables, grills, stoves, refrigeration equipment, and the like. (Exhibit 10). It spent over $200,000 on the equipment alone. Id. The lease was authorized by Written Consent of Flab's directors and extended thereafter. (Exhibits 7 and 8).

Flab opened the restaurant in the mid-late 1980's and operated it independent of Volpe-Vito. It purchased food and liquor inventory, kept track of sales, paid sales taxes, hired and fired employees, and -- independent of Volpe-Vito -- operated in the same fashion as thousands and thousands of restaurants that operate in a leased facility.

Frank was Flab's sole shareholder and director until his death in 1990. (Exhibit 7). At that time, Nancy Stramaglia ("Nancy"), Frank's sister, became the sole shareholder and director of Flab. Nancy was also an officer of Flab as was Edward Chapman, Esq. ("Chapman"), an accountant, attorney and retired Michigan District Court judge. (Id).

Flab maintained its own, separate bank accounts. It also has kept separate corporate documents (Exhibit 7), detailed financial statements (Exhibit 11) and meticulous accounting records. (Exhibit 6). Flab's annual sales frequently totaled hundreds of thousands of dollars. (Exhibit 11). Flab paid rent to Volpe-Vito. (Id). Originally, the rental rate was $3,500 per month or $42,000 annually. (Exhibit 8). It was later increased to $5,000 per month or $60,000 per year. Thereafter, in the year 2000, the rent was reduced due to the poor economic climate. (Id).

Flab filed separate tax returns for each year.[4] It collected and accounted for its own revenues that were deposited into its own account. Occasionally, Flab entered into transactions with Volpe-Vito or Auburn Park given that these entities -- although separately operated with

---

[4]These returns are in Defendant's possession and were produced in discovery. They are not attached because they are voluminous. They are available.

separate books, records and accounts -- did rely upon the success of each other to some extent.[5]
Any transaction between Flab and Volpe-Vito and/or Auburn Park, however, was undertaken for
a proper business purpose and properly documented in detail on the books of Flab.

### 3.   Auburn Park.

Auburn Park was formed in March of 1992. (Exhibit 12). Nancy was its incorporator
and sole shareholder.  Upon formation, its initial director was Nancy who was also Auburn
Park's President and Secretary. Chapman was its Treasurer. (Id).

In 1992, Auburn Park negotiated and entered into a concession agreement with Volpe-
Vito to operate and manage the Park (with the exception of the restaurant). (Exhibit 13). Its
authority to do so was confirmed by Written Consent of its Board of Directors. (Exhibit 12).
After the concession agreement was executed between Volpe-Vito and Auburn Park, Auburn
Park began to operate the Park which it did for nearly a decade. Auburn Park purchased goods
(and some equipment), hired and fired employees, charged admission from customers, paid
expenses and conducted a successful business independent of Volpe-Vito. (Exhibit 14). During
some years its gross receipts exceeded a million dollars. (Id). All of these activities were
conducted independent of Volpe-Vito. (Exhibit 6).

Auburn Park maintained separate bank accounts (Exhibit 6), detailed financial records
(Exhibits 6 and 14) and meticulous bookkeeping records. Its funds were segregated in its
separate account. (Exhibit 6). Auburn Park filed separate tax returns[6], paid salaries and wages
(that totaled hundreds of thousands of dollars per year for many years) and properly accounted
for and (for many years) paid employment taxes on those amounts. (Exhibit 6).

---

[5]For example, a restaurant could not successfully operate at the Park without an amusement park operation and vice
versa.

[6]See note 4 supra.  The same is true for Auburn Park's tax returns.

In 1994, Nancy resigned from the Board and as President of Auburn Park. She also transferred her shares in Auburn Park. Shortly thereafter, Stramaglia became the sole shareholder and a director of Auburn Park. Nepa also became an officer in 1997.

In 2001, the concession agreement between Auburn Park and Volpe-Vito was terminated due to Auburn Park's failure and/or inability to comply with its terms. (Exhibit 4).

In short, Auburn Park operated from March 1992 until December 2001 when its concession agreement was terminated. During that time, Auburn Park generated nearly $10 Million in revenue. It paid rent/concession fees to Volpe-Vito of over $1.6 Million. Any transactions between Auburn Park and Volpe-Vito, Flab and/or Stramaglia were undertaken for proper business reasons, were properly documented and were at arms-length.[7]

### 4.    Mill.

Mill was originally incorporated as Frank V. Louis Equipment Company in December of 1976 by Stramaglia and Frank. (Exhibit 15).[8] The business of Mill evolved and developed in part as a result of a merger between Vito's Trucking & Excavating Co. (a company originally incorporated in 1963 by Stramaglia's father) and Frank V. Louis Contracting Company. Mill has operated for over three decades and has performed various construction projects throughout the country. In the 1990's its work began to focus upon real estate development rather than construction. This caused the owners to change the name to Mill Contractors & Developers, Inc. (Exhibit 16 pp. 44-47). Mill (and its predecessor) successfully operated in the construction/development business for decades. It has maintained a separate existence by

---

[7]Inter-company transactions were required by the nature of the business conducted by the Taxpayers. For example, a substantial amount of the business done by Flab and Auburn Park -- 40% to 50% -- was in the form of group outings and group picnics. The customers wanted the services offered by both Flab and Auburn Park (i.e., food and recreation). However, the customers wanted a single contact person. To accommodate this, Auburn Park would book the outing and collect a single deposit check and/or a single payment check. This required Auburn Park to account to Flab and necessitated inter-company transactions.

[8]Its name was later changed to Frank V. Louis Contracting Company. (Id).

maintaining its own bank accounts, keeping detailed financial records and financial statements and operating as a separate company. It has filed tax returns for each year and not commingled its assets or property with any other business or entity. (Exhibit 6).

Mill did much of the construction work at the Park under contract with Volpe-Vito. It was paid hundreds of thousands of dollars and carried a note for a substantial amount of money. The note was properly documented and properly recorded on the books of Mill and Volpe-Vito. (Exhibits 17 and 22). In general, Mill has engaged in no transactions of any type with the Taxpayers.[9] It simply has had no dealings with either Flab or Auburn Park. After Frank died, Stramaglia became the sole shareholder of Mill.

### 5.   **Melton.**

Melton was formed in 2003 as a Michigan limited liability company. Its original members were Mill and two independent builders, Sam Meram and Tony Hermiz -- with each owning one-third. Subsequently in May of 2005, Stramaglia acquired an interest and now Melton is owned by all four. (Exhibit 18). Melton was formed on an arms-length basis to develop real estate and construct the improvements. It is entirely separate and distinct from the Taxpayers. Melton has had no dealings with Flab or Auburn Park. Until May of 2005, Melton was controlled by Sam Meram and Tony Hermiz who owned a 66.6% interest in Melton.

### C.   **The Tax Liability**

For many, many years, the Park operated smoothly and without incident. Many years were profitable for Flab, Auburn Park and Volpe-Vito. All debts were paid. All taxes, including employment taxes were paid. Nothing was out of the ordinary.

---

[9]There were a couple isolated loans made by Mill that do not aggregate to more than $50,000.

In the late 1990's and early 2000's economic factors caused the Park operations generally to become less profitable. Several municipalities began opening taxpayer funded water parks which provided competition previously not seen by the Park. School schedules were changed and children returned to school prior to the Labor Day holiday. These and other factors impacted the Park in a negative way. The weather was always a concern and was not favorable during those years.

Although some years continued to be successful and each year hope sprang eternal that the next would be profitable, losses did mount to some degree. In the early 2000's, Auburn Park began to be unable to pay the amounts due under the concession agreement as its revenues from operations began to fall. The year 1999 saw Auburn Park's revenue fall to about $725,000 -- less than 60% of what had been generated just a few years prior.[10] Falling revenues from a poor economic climate left Auburn Park -- and the lessor, Volpe-Vito -- in a distressed economic condition. After Auburn Park was unable to pay amounts due under the concession agreement, Volpe-Vito terminated the concession agreement as of December 31, 2001. Volpe-Vito attempted to operate the Park -- without success -- for a couple of years after it ousted Auburn Park. It then closed the Park. Without the Park, Flab could not survive and also ceased business.

In addition to the failure to pay Volpe-Vito, Auburn Park did not pay various amounts due to the IRS. After the Park closed, Flab also owed a relatively small amount to the IRS. The amounts owed (again, the Tax Liability totaled about $150,000 before statutory additions of which about $25,000 was owed by Flab) remained unpaid.

The IRS never seriously pursued the assets of Auburn Park or Flab to satisfy the Tax Liability. Indeed, offers to surrender the assets of those entities to the IRS were declined by the IRS. Instead, the IRS chose to pursue the Third Parties claiming that the Third Parties are "alter

---

[10]Revenue was over $1.3 Million in 1995.

egos" of the Taxpayers. As appears below, the IRS is unable to offer any proof or admissible evidence that the Third Parties are the alter ego of the Taxpayers. Since the IRS will have the burden of proof on this issue at trial, summary judgment in favor for the Taxpayers is appropriate on all issues (with the exception of damages) for the reason that there are no genuine issues of material fact.

\* \* \*

## ARGUMENT

### I.    THE TEST FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56 (c). The moving party bears the burden of proving that there are no genuine issues of material fact. Bennett v. City of Eastpointe, 410 F.3d 810, 817 (6th Cir. 2005). This burden is satisfied by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. Pack v. Damon Corp., 434 F.3d 810, 813 (6th Cir., 2006). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. Pack, 434 F.3d at 813. The nonmoving party may not merely rely upon its pleadings but must provide evidence that sets forth specific facts showing that there is a genuine issue for trial. Roger Miller Music, Inc. v. Sony/ATV Publishing, LLC, 477 F.3d 383, 389 (6th Cir., 2007). Moreover, the evidence of the nonmoving party must be admissible at trial; hearsay is not proper. U.S. Structures Incorporated v. J.P. Structures Incorporated, 130 F.3d 1185, 1189 (6th Cir., 1997). Finally, to avoid summary judgment, the nonmoving party must provide substantial evidence from which a jury could reasonably find for the nonmoving party. Hopson v. DaimlerChrysler Corporation, 306 F.3d 427, 432 (6th Cir., 2002). The existence of a mere scintilla of evidence that supports the nonmoving parties' claim is insufficient to defeat summary judgment. Roger Miller, 477 F.3d at 389.

Proper application of the summary judgment standard is particularly appropriate in this case because Defendant bears the burden of proving that the Third Parties are the alter ego of the Taxpayers -- i.e., that the Corporate Veil of the Taxpayers must be pierced -- in order to prevail

at trial.  This is true because Michigan law[11] treats a corporation as an entirely separate entity from its stockholders, even where only one person owns all the corporation's stock.  See Foodland Distributors v. Al-Naimi, 220 Mich. App. 453 (1996); Olympic Forest Products, Ltd. v. Cooper, 148 Fed. Appx. 260; 2005 U.S. App. LEXIS 14854 (6th Cir., 2005).  See also Laborers' Pension Trust Fund v. Sidney Weinberger Homes, Inc., 872 F.2d 702, 704 (6th Cir., 1988)[12].  ("It is true that there is a presumption that a corporation is a separate entity from its shareholders").

As appears below, Defendant is unable to make a  showing sufficient to avoid summary judgment in this case.  There is no evidence Defendant can provide that will enable it to carry its burden of demonstrating that the corporate veil of the Taxpayers should be pierced.

## II.    THE THIRD PARTIES ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE THE CORPORATE VEIL OF THE TAXPAYERS MUST BE RESPECTED.

As set forth above, Michigan law creates a presumption that the corporate form will be respected.  See Servo Kinetics, Inc. v. Tokyo Precision Instruments Co., 475 F.3d 783, 798 (6th Cir., 2007).  As recognized in Servo Kinetics,

> "This presumption, often called the 'corporate veil' may be pierced only when an otherwise separate corporate existence has been used to subvert justice or cause a result that is contrary to some overriding public policy . . . Michigan courts will not pierce the corporate veil unless (1) the corporate entity was a mere instrumentality of another entity or individual; (2) the corporate entity was used to commit a fraud or wrong; and (3) the plaintiff suffered an unjust loss." (Citations omitted).

---

[11]It is apparent that Michigan law applies to this case.  See PBV Inc. v. Rossetti, 99-1 U.S. Tax Case (CCH) P. 50,490; 1999 U.S. App. LEXIS 6393 (6th Cir., 1999).  All unreported cases are attached at Exhibit 19.

[12]Although Sidney Weinberger Homes correctly identifies the presumption, its alter ego analysis is not applicable to this case because it involved an ERISA case and the potential deprivation of employee benefits.  As the Court recognized, "the recognition of corporate form can be related to legislative policies" and "deference to the corporate identity may be particularly inappropriate in relation to ERISA . . ." Sidney Weinberger Homes, 872 F.2d at 705.

See also Chrysler Corporation v. Ford Motor Company, 972 F. Supp. 1097, 1105 (E.D. Mich., 1997) (piercing the corporate veil is only appropriate where some culpable conduct is shown in addition to the existence of such a unity of interest and ownership that the separate personalities of the corporation and its owner cease to exist. Wrongdoing must be established. The corporate veil may be pierced only where an otherwise separate existence has been used to subvert justice or cause a result that is contrary to clearly overriding public policy); City of Dearborn v. DLZ Corporation, 111 F. Supp.2d 900 (E.D. Mich. 2000) (under Michigan law, corporate veil may be pierced only where an otherwise separate corporate existence has been used to subvert justice or cause a result that is contrary to some other clearly overriding public policy); Seasword v. Hilti, Inc., 449 Mich. 542, 548 (1995) (same).

Michigan law also recognizes that a court's refusal to recognize the ordinary immunity of stockholders "not only overturns a basic provision of statutory and common law, but is also contrary to a vital economic policy underlying the whole corporate concept". Gledhill v. Fisher & Co., 272 Mich. 353, 358 (1935). As such, any decision to pierce the corporate veil must be viewed as "an extraordinary exception". Id.

Finally, it is well-established that forming a corporation "for the avowed purpose of avoiding personal responsibility does not in itself constitute fraud justifying the disregard of the corporate entity". Gledhill, 272 Mich. at 359. Indeed, according to the Michigan Supreme Court, "many a man incorporates his business or his property and is the dominant and controlling feature of the corporation. He may do so for the very purpose of escaping personal liability." Gledhill, 272 Mich. at 360.

In this case, it is undisputed that the Taxpayers, (i.e., Auburn Park and Flab) were properly formed as Michigan corporations. There is a presumption, therefore, that they are

separate and distinct from the Third Parties (i.e., Volpe-Vito, Mill and Melton [entities that were also indisputably properly formed] as well as Stramaglia).

There is no evidence that supports any of the three elements which must be shown to exist to justify piercing the corporate veil of the Taxpayers. Defendant simply cannot demonstrate that the Taxpayers were a mere instrumentality of the Third Parties; that the corporate entity of the Taxpayers was used to commit a fraud or wrong; or that Defendant suffered an unjust lost.

### A.   The Taxpayers Are Not A Mere Instrumentality of The Third Parties.

In order to avoid summary judgment as to each of the Plaintiffs, Defendant must show that Flab and/or Auburn Park were a mere instrumentality of each Plaintiff. This is a showing that Defendant simply cannot make.[13]

Flab ran a legitimate restaurant operation. It owned a liquor license, restaurant equipment, inventory, furniture and the like. It operated on real estate owned by Volpe-Vito -- but did so pursuant to a duly executed lease. Flab generated its own revenue, paid its own expenses and operated as an enterprise that was separate from the Third Parties in every way. It filed tax returns, had financial statements prepared, maintained meticulous accounting records and kept separate corporate records. During its operation, Flab generated several millions of dollars in revenue. It segregated its funds and retained its own assets.

There was no common ownership between Flab and any of the Third Parties. Flab was originally solely owned by Frank. After Frank's untimely death, Nancy acquired the stock of Flab and she continues to own it. Although Stramaglia was an officer of Flab and assisted to some degree in its operation after Frank's death, he never was an owner. Flab hired, fired and

---

[13]To a large degree, Plaintiffs are at a loss to even discuss what factors Defendant may choose to focus upon as it attempts to make this showing. Defendant's Interrogatory responses contain a "laundry list" of allegations that are irrelevant, insignificant, misleading, demonstrably wrong and not substantiated by any person with knowledge.

paid its own employees who worked only for Flab. No assets or funds of Flab were commingled with the assets or funds of any other entity. Admittedly, Flab engaged in certain business transactions and even some loans with Volpe-Vito. This, however, is neither uncommon nor improper. To some degree, Volpe-Vito's success depended upon Flab's success or, at least, its survival. Moreover, each transaction had a legitimate business purpose and was properly documented.

The Sixth Circuit Court has recognized that a corporation is not the mere instrumentality of its stockholder (or another) where it maintains its own financial records and bank accounts and, where loans are made with an arguably related company, "the loans were documented on the books of both companies." Precision, Inc. v. Kenco/Williams, Inc., 66 Fed. Appx 1; 2003 US App LEXIS 5740 (6th Cir., 2003). On the contrary, it is where corporate formalities are ignored, the distinction between the corporation and its owner is "blurred" and funds are commingled into a central account -- none of which appear in this case -- that alter ego liability may be found. See Olympic Forest Products Ltd. v. Cooper, 148 Fed. Appx 260; 2005 U.S. App. LEXIS 14854 (6th Cir., 2005); Grass Lake All Seasons Resort Inc. v. United States, 2005 2 U.S. Tax Case (CCH) P. 50, 580; 2005 U.S. Dist. LEXIS 22448 (E.D. Mich, 2005).

Flab's operation as a matter of undisputed fact does not lend itself to a situation where the corporate veil may be pierced. Flab is not and has never been a mere instrumentality of any of the Third Parties.[14]

This is also true for Auburn Park. Auburn Park was the operating company for the Park from 1992 to 2001. It owned various property and leased other property pursuant to a bona fide,

---

[14]Indeed, it was regulated by the Michigan Liquor Control Commission which insures that it is operated in a certain manner as prescribed by the Commission

arms-length agreement with Volpe-Vito.   Auburn Park was established largely upon the recommendation -- if not the insistence -- of Volpe-Vito's lender, Bank One.

Like Flab, Auburn Park operated as an independent business enterprise.   It maintained separate bank accounts, had financial statements prepared, maintained meticulous accounting records and kept separate corporate books.   Auburn Park filed separate tax returns, paid its own expenses and operated independent of Flab and Volpe-Vito.

With the exception of some common officers and directors, during some time periods, Auburn Park and Volpe-Vito had separate employees that were carried on separate payrolls. (Exhibits 20 and 21).[15]   There was no overlap in the duties performed by the employees.   Flab's employees did restaurant work.   Auburn Park's employees attended to the water park.   In fact, they wore different color shirts to differentiate them.   The fact that there were times when the companies had common directors does not establish alter ego liability.   Precision, Inc. v. Kenco/Williams, Inc., supra (although companies may have the same board of directors, this does not establish alter ego liability).   Again, each operation stood on its own and no part of any operation -- including the receipt and retention of funds -- was intertwined or commingled with any other.[16]   Auburn Park regularly generated six figure revenues and in some years grossed over $1M dollars.   Indeed, over the years, Auburn Park generated nearly $10 Million in revenue.   Its funds were not commingled with those of Stramaglia or any other entity.   Like Flab, Auburn Park may have had business transactions and/or loans with Volpe-Vito.   However, there was always a proper business purpose and meticulous documentation to evidence same.

There is simply no basis upon which Defendant can seriously argue that the Taxpayers were a mere instrumentality of any of the Third Parties, Volpe-Vito, Mill, Melton or Stramaglia.

---

[15]Volpe-Vito also had its own employees who only attended to its business.

[16]As set forth above, see note 6, certain inter-company transactions were inevitable due to the nature of the business.

In fact, the Third Parties do not believe that Defendant will be able to show *any* transactions and/or dealings between the Taxpayers and Mill or Melton.[17]   Any transactions or dealings between the Taxpayers and Volpe-Vito or Stramaglia were legitimate, fair, properly documented, and undertaken for proper business purposes and adequate consideration.   Defendant will be unable to demonstrate otherwise.

### B.   The Corporate Entities of The Taxpayers Were Not Used To Commit A Fraud or Wrong.

Defendant will also fail in any attempt to demonstrate that the corporate entities of the Taxpayers were used to commit a fraud or wrong as it must do to avoid summary judgment.

Even if Defendant could demonstrate that the Taxpayers were operated as a mere instrumentality of the Third Parties -- and it cannot -- the Third Parties are entitled to summary judgment unless Defendant can also show the existence of fraud or wrongdoing -- i.e., that the separate corporate existence has been used to subvert justice or to cause a result that is contrary to some other clearly overriding public policy.   Chrysler Corporation v. Ford Motor Company, 972 F. Supp. 1097 (E.D. Mich., 1997).   City of Dearborn  v. DLZ Corporation, 111 F. Supp. 2d 900, 902 (E.D. Mich.,  2000).

These operative principles are illustrated by Chrysler Corporation.   In that case, it was argued that the corporate veil should be pierced because the corporation failed to observe proper corporate formalities, commingled assets and the parent and subsidiary corporation had identical directors.   Chrysler Corporation, 972 F. Supp. at 1105.   The Court determined that it was appropriate to first address whether there was fraud or wrongdoing sufficient to justify piercing the corporate veil.    If not, the other factors were immaterial.   The Court in Chrysler Corporation correctly held that (i) the existence of interlocking directors, managers and employees "could not

---

[17]See note 8, supra.

be sufficient to pierce the corporate veil unless there was an additional showing that this was done for a wrongful purpose; (ii) the consolidation of many operational areas between parent and subsidiary did not justify alter ego liability because the companies segregated assets and earnings and no improper purpose was shown; and (iii) the subsidiary's purchase of all of the parent's assets and the assumption of all its liabilities did not warrant alter ego treatment even though there was an identity of ownership and management.   The overriding factor in the Court's decision to sustain the corporation's separate existence was that the potential liability involved in the case before it was not considered when the relationship between the parent and subsidiary was structured and the corporation's activities were not undertaken in an effort to avoid such liability.

The holding of Chrysler Corporation is applicable to this case.  It is beyond dispute that Auburn Park and Flab were not established with an eye toward the avoidance of employment taxes.  In fact, each corporation operated for years successfully and paid these obligations. Although economic conditions changed -- and deteriorated -- causing financial stress to Auburn Park and Flab, they did not change the way operations were conducted.   There was no wrongdoing or fraudulent intent.[18]  Corporate forms were not changed or manipulated . Nothing was done to subvert justice or to cause a result contrary to a clearly overriding public policy.

Defendant has offered no suggestion as to how it intends to make a showing of wrongdoing or fraud.  Defendant can come forward with no evidence -- because none exists-- that suggests that any of the Third Parties were benefited by the fact that employment taxes were

---

[18]Contrast Grass Lake All Seasons Resort where the court found evidence of fraudulent intent since, among other things, the owner "extracted large amounts of money for his personal use while allowing tax and other liabilities to remain unpaid", the amounts transferred out of the corporation to a related company exceeded the amounts transferred into the corporation by the related corporation and, according to the court, the owners had done "whatever they can do" to conduct business without paying taxes.  There is no such evidence in this case.

not paid by Flab or Auburn Park.  In fact, none of the Third Parties were benefited by any of the transactions that were undertaken between them and Flab and/or Auburn Park.[19]  At the end of the day, Auburn Park, and to a much lesser degree Flab, received value from Stramaglia and/or Volpe-Vito that far exceeded anything transferred to Stramaglia or Volpe-Vito by either or both of them.  (Exhibit 6).

## CONCLUSION

Summary judgment is proper in this case.  Defendant cannot sustain its burden of proof showing that the Third Parties are the alter ego of the Taxpayers.  Except for the amount of damages to which Plaintiffs are entitled, there is no genuine issue of material fact and judgment should enter for Plaintiffs.

<div style="margin-left: 40%">

s/John A. Ruemenapp
Weisman, Young, Schloss & Ruemenapp, P.C.
30100 Telegraph Road, Suite 428
Bingham Farms, MI  48025
(248) 258-2700
(248) 258-8927
jruemenapp@wysr-law.com
(P34796)

</div>

Dated:  August 3, 2007

---

[19]Again, as explained above, there were no such transactions involving Mill or Melton.

## CERTIFICATE OF SERVICE

I hereby certify that on August 10, 2007, I electronically filed the foregoing paper with the Clerk

of the Court using the ECF system to the following ECF participant: **Christine S. Hooks**, Trial

Attorney, Tax Division, U.S. Department of Justice, Post Office Box 55, Ben Franklin Station,

Washington, D.C. 20044 @ Christine.S.Hooks@usdoj.gov.

> s/John A. Ruemenapp
> Weisman, Young, Schloss & Ruemenapp, P.C.
> 30100 Telegraph Road, Suite 428
> Bingham Farms, MI 48025
> (248) 258-2700
> jruemenapp@wysr-law.com
> (P34796)

F:\CLIENTS\S\Stramaglia Louis 6246-\Tax Issues -6525\Pleadings\Brief in Support of Ps' Motion for Summary Judgment.doc/yah