IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LOUIS STRAMAGLIA,                              )
VOLPE-VITO, INC. d/b/a FOUR BEARS              )
WATER PARK, a Michigan corporation,            )
MILL CONTRACTORS & DEVELOPERS,                 )
a Michigan corporation, and                    )
MELTON ROAD DEVELOPMENT                        )
COMPANY, a Michigan limited liability          )      Civil No. 06-13764
company,                                       )
                                               )      Honorable John Corbett  O'Meara
              Plaintiffs,                       )
                                               )      Referral Judge: Wallace Capel
       v.                                      )
                                               )
UNITED STATES OF AMERICA                       )
                                               )
              Defendant.                        )


UNITED STATES' OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT

CHRISTINE S. HOOKS
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 55
Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 514-6060
Fax: (202) 514-5238
Email: Christine.S.Hooks@usdoj.gov

## TABLE OF CONTENTS

Table of Authorities.......................................................................................ii

Index of Exhibits........................................................................................iii

Brief in Opposition.......................................................................................1

Statement of the Issue...................................................................................1

Statement of Material Facts............................................................................1

Argument....................................................................................................9

I.  The Burden............................................................................................9

II. Volpe-Vito and Mr. Stramaglia are

     Alter Egos of Auburn Park and Flab..........................................................10

A.  The United States May Collect Tax Liabilities

     From the Alter Ego of a Taxpayer.............................................................10

B.  Auburn Park and Flab were Mere Instrumentalities of

     Volpe-Vito and Mr. Stramaglia................................................................11

          1.        Volpe-Vito, Auburn Park, and

                     Flab Were Instrumentalities of Each Other...........................12

          2.        Volpe-Vito, Auburn Park, and Flab

                     Were All Instrumentalities of Mr. Stramaglia.......................15

C.  Auburn Park's and Flab's Use of the Corporate Veil to
     Avoid Paying Federal Tax Liabilities is a Wrong.....................................16

D.  The United States Has Suffered an Unjust Loss.......................................19

III. The Plaintiffs Are Nominees or Transferees...........................................19

## TABLE OF AUTHORITIES

Ames Investment, Inc. v. United States, 36 F.3d 1097 (6th Cir. 1994) (Table) . . . 8

Anderson v. Abbott, 321 U.S. 349, 362-363 (1944)...................................................11, 17

Bodenhamer Bldg. Corp. v. Architectural Research,
873 F.2d 109, 111 (6th Cir. 1989)...............................................................................11, 17

Chrysler Corp. v. Ford Motor Co., 972, F. Supp. 1097 (E.D. Mich. 1997)...............17, 18

Foodland Distribs. v. Al-Naimi,
220 Mich.App. 453, 559 N.W.2d 379, 381 (1996)....................................................11

G.M. Leasing Corp. v. United States, 429 U.S. 338, 350-51 (1977).........................10

Gledhill v. Fisher & Co., 272 Mich. 353, 262 N.W. 371 (1935)...............................17

Grass Lake All Seasons Resort v. United States,
No. 01-CV-74386, 2005 U.S. Dist. LEXIS 22448 (E.D. Mich. Aug. 29, 2005)........17, 19

Hamilton v. Carell, 243 F.3d 992, 1004 (6th Cir. 2001)...........................................11

Herman v. Mobile Homes Corp., 317 Mich. 233, 26 N.W.2d 757, 760-761 (1947)..12, 17

Laborers' Pension Trust Fund v. Sidney Weingerger Homes, Inc.,
872 F.2d 702, 704-05 (6th Cir. 1988)..........................................................................11, 12

Porta-John of America, Inc. v. United States,
4 F. Supp. 2d 688, 699 (E.D. Mich. 1998)..................................................................10, 11, 20

Servo Kinetics, Inc. v. Tokyo Precision Instruments Co.,
475 F.3d 783, 798 (6th Cir. 2007).................................................................................passim

Sumpter v. United States, 302 F. Supp. 2d 707, 719 (E.D. Mich. 2004)....................10

**INDEX OF EXHIBITS**

| Government Exhibit | | Description |
|---|---|---|
| 1 | | Trust Fund Payment Receipts |
| 2 | | Request for Approval |
| 3 | | Office of Chief Counsel Memorandum |
| 4 | | Deposition of Thomas Nepa |
| | 4-1 | Exhibit 1 |
| | 4-2 | Exhibit 2 |
| | 4-3 | Exhibit 3 |
| | 4-4 | Exhibit 4 |
| | 4-5 | Exhibit 5 |
| | 4-6 | Exhibit 6 |
| | 4-7 | Exhibit 7 |
| | 4-8 | Exhibit 8 |
| | 4-9 | Exhibit 9 |
| | 4-10 | Exhibit 10 |
| | 4-11 | Exhibit 11 |
| | 4-12 | Exhibit 12 |
| | 4-13 | Exhibit 13 |
| | 4-14 | Exhibit 14 |
| | 4-15 | Exhibit 15 |
| | 4-16 | Exhibit 16 |
| | 4-17 | Exhibit 17 |
| | 4-18 | Exhibit 18 |
| | 4-19 | Exhibit 19 |
| | 4-20 | Exhibit 20 |
| 5 | | Deposition of Louis Stramaglia |
| 6 | | Affirmation of Guaranty |
| 7 | | Mill's Answers to Interrogatories |

8                           Park Invoices

9                           Restaurant Invoices

10                          Four Bears Water Park Stationary

## UNITED STATES' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

NOW COMES the United States, through its attorney, and opposes the Plaintiffs' motion for summary judgment (Dkt. No. 14) pursuant to Rule 56 of the Federal Rules of Civil Procedure.  In support of its opposition, the United States submits the following brief.

## STATEMENT OF THE ISSUE

1.	Whether the Plaintiffs are entitled to summary judgment with regard to their argument that the Plaintiffs are not the alter egos of

## STATEMENT OF MATERIAL FACTS

1.  The Plaintiffs, Louis Stramaglia ("Stramaglia"), Volpe-Vito d/b/a Four Bears Water Park ("Volpe-Vito"), Mill Contractors & Developers ("Mill"), and Melton Road Development Company ("Melton"), commenced this action on August 24, 2006.  (Compl.)  The Internal Revenue Service ("IRS") has assessed employment tax liabilities against Auburn Park Managing Company, Inc. ("Auburn Park") for tax periods ending in years 1995 through 2001.  (Amend. Compl. Ex. B)  The IRS has assessed employment tax liabilities against Flab, Inc. ("Flab") for tax periods ending in 1997 through 2001.  (Amend. Compl. Ex. A)[1]

2.  In December 2005, IRS Revenue Officer Rebecca Mayer ("RO Mayer") requested approval from IRS Area Counsel to file Alter Ego/Nominee/Transferee Liens in the names of Louis Stramaglia, Volpe-Vito, Mill, and Melton to collect the tax liabilities owed by Auburn Park and Flab and IRS Area Counsel approved the request in February 2006.  (Govt. Ex. 2; Govt. Ex. 3)  In March 2006, the IRS recorded Notices of Federal Tax Lien naming Mr. Stramaglia and Volpe-Vito as alter egos, nominees, or transferees of Auburn Park and Flab and the IRS issued Notices of Levy to various third parties. (Answer ¶¶ 10, 11, 13, 14; Amend. Compl. Exs. A, B, C, D, E, F, G, H)  In August 2006, the IRS recorded Notices of Federal Tax Lien naming Mill and Melton as alter egos, nominees, or transferees of Auburn Park and Flab.  (Answer ¶¶ 15, 16;

---

[1] Contrary to the Plaintiffs' assertions, as of March 14, 2006, after payment of "trust fund" recovery penalties by Mr. Stramaglia as a responsible person pursuant to 26 U.S.C. § 6672, the unpaid balance of the assessments against Auburn Park and Flab were $272,144.40 and $37,309.23, respectively.  (Amend. Compl. Exs. A, B; Govt. Ex. 1 (showing payments made in late 2004 and early 2005); contra Pls' Mot. Summ. Judg. 2)

Amend. Compl. Exs. I, J)

3. Volpe-Vito was formed in 1981. (Pls' Mot. Summ. Judg. 2; Pls' Exs. 1 and 2) In 1982, Mr. Stramaglia and his brother Frank Stramaglia each acquired 25% of the outstanding shares of Volpe-Vito. (Pls' Mot. Summ. Judg. 3; Pls' Ex. 4, pp. 18-21) Pursuant to the stock subscription agreement, Mr. Stramaglia and Frank Stramaglia were each obligated to pay $150,000 for their shares of Volpe-Vito stock. (Pls' Ex. 4, p. 25) From the year 1996 to the present, the plaintiff, Mr. Stramaglia, was the sole shareholder of Volpe-Vito. (Pls' Mot. Summ. Judg. 3; Pls' Ex. 4, p. 65) Mr. Stramaglia has been the president of Volpe-Vito since 1987. (Pls' Ex. 4, pp. 45-46) During the 1980s, Volpe-Vito borrowed funds from its shareholders, including Mr. Stramaglia, and gave those shareholders promissory notes that included payment terms and provided for the payment of interest. (Pls' Ex. 4, pp. 16, 17, 26, 27, 35-40) Volpe-Vito maintained bank accounts in its name, prepared financial statements, and kept bookkeeping records. (Pls' Mot. Summ. Judg. 3; Pls' Exs. 5, 6)

4. Since 1997, Volpe-Vito has had two directors, Mr. Stramaglia as president and Thomas Nepa as Secretary. (Pls' Mot. Summ. Judg. 3; Pls' Ex. 4, p. 53) Since 1992 Mr. Nepa has also been the in-house accountant/bookkeeper for Volpe-Vito, as well as for Auburn Park and Flab. (Pls' Mot. Summ. Judg. 3; Govt. Ex. 4, pp. 9-10) At the time that Mr. Stramaglia purchased shares in Volpe-Vito, Volpe-Vito owned the real property known as 3000 Auburn Road, Shelby Township, Michigan ("3000 Auburn"), on which a lake was located. (Govt. Ex. 5, p. 13) Around the time in 1982 that Mr. Stramaglia and his brother Frank Stramaglia purchased shares in Volpe-Vito, the shareholders of the corporation decided to develop the property, 3000 Auburn, into a water park, and the shareholders loaned funds to Volpe-Vito for that purpose. Volpe-Vito also obtained a mortgage from National Bank of Detroit to provide funding for the development. (Govt. Ex. 5, p. 12) Mill (then known as FVL Contracting) and B&V Construction performed the construction work necessary to develop 3000 Auburn into a water park. (Govt. Ex. 5, p. 60) Volpe-Vito paid a portion of the bills for this construction work, and the remaining balances were reflected on Volpe-Vito's books as loans to Volpe-Vito from Mill and B&V Construction. (Id.)

5. Volpe-Vito purchased park equipment for use in the water park business. (Govt. Ex. 5, p. 13-14) As part of the development, Volpe-Vito built a main building and some other

buildings at 3000 Auburn.  Volpe-Vito's office is located in the main building.  (Govt. Ex. 5, p. 35)

6.  In 1983, Volpe-Vito filed a certificate of assumed name stating that Volpe-Vito's assumed name was Four Bears Water Park.  (Pls' Ex. 1, p. 9)  Four Bears Water Park began operating in 1983.  (Govt. Ex. 5, p. 14)  When Four Bears Water Park began operating, Volpe-Vito had approximately 150 employees, which included park attendants, maintenance workers, security guards, and ticket takers.  (Govt. Ex. 5, p. 14-15)

7.  Flab was incorporated in 1983 by Frank Stramaglia, made an initial contribution of capital of $5,000 and became the owner of 100% of the outstanding stock in the corporation.  (Pls' Mot. Summ. Judg. 3; Pls' Ex. 7, p. 11; Govt. Ex. 5, p. 40)  Flab was formed for the purpose of providing food service at Four Bears Water Park.  (Govt. Ex. 5, p. 39-40)  Flab operated the Honey Bears Restaurant, which was located in the main building at 3000 Auburn, and some food stands located outside the main building.  (Govt. Ex. 5, p. 41; Nepa Deposition, Govt. Ex. 4, p. 45-46)  33.  Flab did not serve food anywhere other than at the Four Bears Water Park at 3000 Auburn.  (Govt. Ex. 5, pp. 40-41)  In May 1983 Flab and Volpe-Vito entered into a lease which allowed Flab to use a portion of the main building at 3000 Auburn for $3,500 per month.  (Pls' Mot. Summ. Judg. 3; Pls' Ex. 8, pp. 11-14)  In January 1985, the lease was renewed, but the monthly rent was increased to $5,000 per month.  (Pls' Mot. Summ. Judg. 3; Pls' Ex. 8, pp. 4-10)  In January 2000, the lease was renewed, but the rent was reduced to $6,000 per year.  (Pls' Mot. Summ. Judg. 3; Pls' Ex. 8, p. 1)  The rent reduction was due to the "poor economic climate," (Pls' Mot. Summ. Judg. 4), or "because the business was starting to get slower and slower. . . . We couldn't justify charging $5,000 a month for the whole year."  (Govt. Ex. 4, p. 142)  From 1983 to 1997, Flab purchased kitchen and other restaurant equipment for use in its food service business, and these assets were depreciated on the books of the company.  (Pls' Ex. 10)  Flab also acquired a liquor license for use in its food service business.  (Pls' Ex. 9)

8.  Frank Stramaglia passed away in 1989, and his sister, Nancy Stramaglia, became the sole shareholder and president of Flab.  (Pls' Mot. Summ. Judg. 4; Pls' Ex. 7, pp. 28-29)  In 1992 or 1993, the plaintiff, Mr. Stramaglia, took over the operations of Flab and became the decisionmaker with authority to sign documents on behalf of Flab.  (Ex. 5, p. 40, 43-44)  In his deposition Mr. Stramaglia stated that he took over the food service operations of Flab because

-3-

"we couldn't do without it."  (Id. at 44)  Mr. Stramaglia did not receive a salary for the work he did for Flab.  (Govt. Ex. 5, p. 43)  Flab maintained bank accounts in its own name, kept corporate documents, prepared financial statements, kept accounting records, and filed tax returns.  (Pls' Mot. Summ. Judg. 4)  Mr. Nepa was responsible for and did prepare Flab's books and accounting records, but he was not an employee of Flab, and did not receive a salary from Flab.  (Govt. Ex. 4, p. 48)

9.  In March of 1992, Auburn Park was incorporated by Nancy Stramaglia, who made an initial contribution of capital of $1,000 and became owner of 100% of the outstanding stock of the corporation.  (Pls' Mot. Summ. Judg. 5; Pls' Ex. 12, pp. 3-4, 15)  At formation, Nancy Stramaglia was Auburn Park's President and Secretary, and Edward Chapman was its Treasurer. (Pls' Mot. Summ. Judg. 5; Pls' Ex. 12, p. 17)  Auburn Park was formed for the express purpose of separating the potential liabilities of Four Bears Water Park from the real property on which the park was located, at the urging of the bank who held a mortgage on the real property.  (Govt. Ex. 5, pp. 16-17)  Prior to 1992, Volpe-Vito had been suffering losses due to injury claims by park patrons every year.  (Govt. Ex. 5, pp. 16-17)

10.  In March 1992, Auburn Park entered into a "Concession Agreement" with Volpe-Vito.  Under the terms of this agreement, Auburn Park was granted the "the right, license, and privilege to operate, manage, and control the entire [Four Bears Water] Park" and use all of the assets of Four Bears Water Park in exchange for weekly payments to Volpe-Vito of 10% of Auburn Park's gross sales.  (Pls' Ex. 13, pp. 1-2)  Auburn Park was also required to purchase liability insurance as well as fire insurance for the buildings located on the property.  (Pls' Ex. 13, p. 3)  Finally, the concession agreement stipulated that Auburn Park would be responsible for maintaining the real property and equipment, as well as hiring, firing, and paying the employees required to operate the Four Bears Water Park.  (Pls' Ex. 13, pp. 3-4)  In March 1993, Auburn Park entered into another Concession Agreement with Volpe-Vito which increased the payment owed by Auburn Park to include an annual payment of $200,000 and the payment of all real estate taxes and assessments for the Four Bears Water Park property.  (Pls' Ex. 13, pp. 6-11)

11.  Once Auburn Park was formed, Auburn Park was responsible for all the operations of the Four Bears Water Park, except for the food service, for which Flab was responsible, and Auburn Park became the employer of all the park attendants and other personnel who operated

-4-

the park.  (Govt. Ex. 5, pp. 18-19)  While Auburn Park was operating the park, "Volpe-Vito didn't have any business, to speak of" and did not have any employees.  (Govt. Ex. 5, pp. 22-23) At the time that it was formed, Auburn Park did not own any property.  (See Govt. Ex. 5, p. 23 (explaining that Auburn Park purchased equipment "after it took over"))  As equipment owned by Volpe-Vito would wear out or become obsolete, Auburn Park purchased equipment for use in the Four Bears Water Park business.  (Id.)

12.  In April 1994, Nancy Stramaglia resigned as president of Auburn Park and transferred her shares of stock to Catherine Stramaglia, Mr. Stramaglia's then-wife.  (Pls' Ex. 12, pp. 18, 20-22)  Also in April 1994, Catherine Stramaglia became President and the plaintiff, Mr. Stramaglia became Treasurer of Auburn Park.  (Pls' Ex. 12, p. 19)  In December 1997, Mr. Stramaglia became President and Mr. Nepa became Secretary of Auburn Park.  (Pls' Ex. 12, p. 19)  In April 1998, Catherine Stramaglia transferred her shares of Auburn Park stock to Mr. Stramaglia and he became the sole owner of the shares in Auburn Park.  (Pls' Ex. 12, pp. 23-24) Around the time that Nancy Stramaglia resigned in April 1994, Mr. Stramaglia took over the responsibility of overseeing the operations of Auburn Park with the authority to make important decisions.  (Govt. Ex. 5, pp. 18-19, 21; see also Govt. Ex. 4, p.36)

13.  When the Four Bears Water Park was open, in the summer, Mr. Stramaglia was there twelve hours a day, seven days a week.  (Govt. Ex. 5, p. 19)  Auburn Park did not pay Mr. Stramaglia a salary for the work he performed.  (Govt. 4, p. 37)  Auburn Park maintained bank accounts in its own name, prepared financial statements, kept bookkeeping records, and filed tax returns.  (Pls' Mot. Summ. Judg. 5)  In 1993, Auburn Park became a guarantor for Volpe-Vito's mortgage with National Bank of Detroit.  (Govt. Ex. 6)  Auburn Park made payments of principal and interest on Volpe-Vito's mortgage with National Bank of Detroit from Auburn Park's checking account.  (Govt. Ex. 5, p. 28; Nepa Deposition, Govt. Ex. 4, p. 109-110; Pls' Ex. 4, p. 55)  In 2001, Auburn Park stopped paying the mortgage payments and taxes, and Volpe-Vito made payments instead.  (Pls' Ex. 4, p. 55)  Volpe-Vito then terminated the Concession Agreement with Auburn Park.  (Id.)

14.  After terminating the Concession Agreement, Volpe-Vito took over the operations of Four Bears Water Park and the next summer employed all the personnel who worked at the park. (Govt. Ex. 5, p. 34)  After terminating the Concession Agreement, all the equipment that Auburn

-5-

Park had purchased was transferred to Volpe-Vito.  (Govt. Ex. 4, p. 34)  Auburn Park's debt to Volpe-Vito was reduced by the book value of the transferred equipment, most of which was fully depreciated.  (Govt. Ex. 4, p. 34)  There was no written agreement between Volpe-Vito and Auburn Park with respect to the transfer of equipment.  (Id.)  Auburn Park was not dissolved at the time that the Concession Agreement was terminated and continued to exist "in name only." (Id.)

15.  During the time that Auburn Park was operating, Auburn Park and Volpe-Vito used the same office in the main building at 3000 Auburn.  (Govt. Ex. 4, p. 40)  Mr. Nepa prepared and kept the books for Volpe-Vito, Auburn Park and Flab during the years that all three were operating.  (Govt. Ex. 4, p. 10)  Mr. Nepa was initially an employee of Volpe-Vito, then became an employee of Auburn Park during the years the Concession Agreement was in effect, and then became an employee of Volpe-Vito when the Concession Agreement was terminated.  (Govt. Ex. 4, p. 48)  During the years that Auburn Park was operating Four Bears Water Park, both Mr. Nepa and Mr. Stramaglia performed duties for both Auburn Park and Volpe-Vito, but neither kept track of the amount of time devoted to each company.  (Ex. 4, p. 40 ("[T]he companies are at the same office.  So I mean you can't justify how much time in each company."))

16.  In 1996 or 1997, Auburn Park opened an investment account with Roney and Company, which later became Raymond James.  (Govt. Ex. 4, p. 23; Govt. Ex. 5, p. 25)  Mill deposited funds into Auburn Park's Raymond James investment account in 2001, and in the year 2000 Mill deposited $47,975 into the account.  (Govt. Ex. 4, pp. 128, 133, Ex. 19, pp. 4019, 4038)  After the Auburn Park Concession Agreement was terminated, Volpe-Vito paid fees for the Raymond James account and the balance of the account was deposited in Volpe-Vito's bank account.  (Govt. Ex. 4, pp. 125-126)

17.  During the years that Auburn Park was operating the Four Bears Water Park, Auburn Park revenues were sometimes deposited in Volpe-Vito's bank account, and Volpe-Vito's revenues were sometimes deposited in Auburn Park's bank account.  (Govt. Ex. 4, pp. 98, 102, 114, 116-117, 118, 127, Exs. 18, 19)  When revenue was deposited in the wrong account, it was treated as a loan on the books of both Auburn Park and Volpe-Vito.  (Govt. Ex. 4, pp. 113-114, Ex. 18 p. 3572, Ex. 19 p. 4030)  During the years that Auburn Park was operating Four Bears Water Park, Auburn Park sometimes paid Volpe-Vito's mortgage and Volpe-Vito sometimes

paid Auburn Park's expenses.  (Govt. Ex. 4, pp. 97, 103-104, 116, 109-110, 123, 134; <u>see also</u> Govt. Ex. 4, Ex. 18 pp. 3572, 3594, 3608, 3616, 3636, 3647)  When Auburn Park and Volpe-Vito paid each other's expenses, the amount was treated as a loan on the books of both companies.  (<u>See</u> Govt. Ex. 4, Ex. 18 pp. 3572, 3594, 3608, 3616, 3636, 3647, Ex. 19 pp. 4005, 4007, 4028, 4030, 4054, 4056, 4073, 4076, 4090, 4093)

18.   During the years that Auburn Park was operating Four Bears Water Park, when Auburn Park needed funds to pay its operating expenses sometimes Volpe-Vito would loan money to Auburn Park, and when Volpe-Vito needed funds to pay its mortgage, sometimes Auburn Park would loan money to Volpe-Vito.  (Govt. Ex. 4, pp. 26-27, 30-32)  In order to provide the funds to loan money to Auburn Park, sometimes Volpe-Vito borrowed money from the bank or from Mr. Stramaglia.  (Govt. Ex. 4, p. 27; Govt. Ex. 5, pp. 26-27)  There is no evidence of a written loan agreement between Volpe-Vito and Auburn Park.

19.   In 2001, three creditors garnished Volpe-Vito's bank account for debts incurred in the operation of Four Bears Water Park.  (Govt. Ex. 4, pp. 95-96, Ex. 19 p. 3560)  The garnished amounts were treated as loans from Volpe-Vito to Auburn Park on the books of both companies.  (Govt. Ex. 4, Ex. 19 p. 3560, Ex. 18 pp. 3998-3999)

20.   Revenues of Flab were deposited into Volpe-Vito's bank account and reflected as an account payable from Volpe-Vito to Flab.  (Govt. Ex. 4, Ex. 19 p. 3630)  Flab also paid expenses of Volpe-Vito and Auburn Park.  (Govt. Ex. 4, pp. 104, 131, 134)  Volpe-Vito and Auburn Park paid expenses of Flab.  (Govt. Ex. 4, pp. 107, 130, 140, 142-143)  In 2001, a creditor garnished Flab's bank account for a debt incurred in the operation of Four Bears Water Park.  (Govt. Ex. 4, pp. 127-128)  In 1999, a creditor garnished Auburn Park's bank account for a debt incurred in the operation of Honey Bears Restaurant.  (Govt. Ex. 4, p. 144)  When expenses or debts of Flab were paid by Auburn Park or Volpe-Vito and expenses or debts of Auburn Park and Volpe-Vito were paid by Flab, the amounts were treated as loans on the books of the companies.  (Govt. Ex. 4, p. 104)  There is no evidence of any written loan agreements between Flab and Auburn Park or Flab and Volpe-Vito.

21.   At the end of each fiscal year, the loan payable accounts and loan receivable accounts between Flab, Auburn Park, and Volpe-Vito were combined on each company's books.  (Govt. Ex. 4, p. 92; <u>see generally</u> Govt. Ex. 4, Exs. 18, 19, 20)  From fiscal years 1997 through

-7-

2001, Auburn Park's largest asset was an account receivable due from Flab, worth between $400,000 and $500,0000.  (See Govt. Ex. 4, Ex. 19; Pls' Ex. 14)  During 2002 through 2004, Auburn Park wrote off over $300,000 of Flab's debt as "uncollectible receivables."  (Govt. Ex. 5, Ex. 19 pp. 3971, 3975, 4004).  Volpe-Vito's list of fixed assets for fiscal year 2005 lists various restaurant and park equipment as acquired on dates from December 31, 1983, through July 18, 2001.  (Govt. Ex. 4, p. 86, Ex. 17 pp. 3430-3431)  Various third party vendors addressed invoices for park equipment and expenses to "Four Bears Water Park."  (Govt. Ex. 8)  Various third party vendors addressed invoices for restaurant equipment and expenses to "Four Bears Water Park."  (Govt. Ex. 9)  Auburn Park and Volpe-Vito both used "Four Bears Water Park" stationary.  (Govt. Ex. 10)

22.  Sometimes Mr. Stramaglia loaned money to Auburn Park to pay operating expenses. (Govt. Ex. 4, p. 39)  Sometimes Mr. Stramaglia loaned money to Volpe-Vito that Volpe-Vito would loan to Auburn Park to pay operating expenses.  (Govt. Ex. 5, pp. 26-27)  Mr. Stramaglia paid expenses for Auburn Park.  (Govt. Ex. 4, Ex. 19 pp. 4006, 4029, 4055, 4074-4075, 4091-4092, 4118)  Auburn Park paid expenses for Mr. Stramaglia and made cash disbursements to Mr. Stramaglia, which were deducted from the debt owed by Auburn Park to Mr. Stramaglia.  (Govt. Ex. 4, Ex. 19 pp. 4006, 4029, 4055, 4074-4075, 4091-4092, 4118)  Auburn Park's debt to Mr. Stramaglia was $95,889.42 at the end of fiscal year 1998.  (Govt. Ex. 4, Ex. 19 p. 4091)  Auburn Park's debt to Mr. Stramaglia was $0 at the end of fiscal year 2002.  (Govt. Ex. 4, Ex. 19 p. 4006)  There were no written loan agreements between Auburn Park and Mr. Stramaglia or Flab and Mr. Stramaglia.  (Govt. Ex. 4, p. 39)

23.  Mr. Stramaglia paid expenses for Flab.  (Govt. Ex. 4, Ex. 19 pp. 138, 142-143, Ex. 20 p. 4311)  Mr. Stramaglia paid mortgage payments and other expenses for Volpe-Vito.  (Govt. Ex. 4, pp. 93, 100-101, 110, 111, 117, Ex. 18 pp. 3568, 3590)  When Mr. Stramaglia paid mortgage payments and other expenses for Volpe-Vito, the amount was added to the total debt owed by Volpe-Vito to Mr. Stramaglia.  (Govt. Ex. 4, pp. 100-101, 111; Govt. Ex. 5, p. 66)  In October 2000, Volpe-Vito transferred real property to Mr. Stramaglia in exchange for a reduction in the debt owed by Volpe-Vito to Mr. Stramaglia, but no formal appraisal was done to value the property.  (Govt. Ex. 5 p. 69; Govt. Ex. 4, Ex. 1)

24.  Mill loaned funds to Auburn Park.  (Govt. Ex. 5, Ex. 19 pp. 4010, 4032, 4058, 4078,

4095)  Sometimes loans from Mill were re-classified on Auburn Park's books as loans from Volpe-Vito.  (Govt. Ex. 5, Ex. 19 pp. 4010, 4032)  Mill loaned funds to Volpe-Vito and made mortgage payments for Volpe-Vito.  (Govt. Ex. 5, Ex. 18 pp. 3570, 3592, 3611, 3632, 3652)  Auburn Park paid expenses for Mill which were then re-classified as though Volpe-Vito paid Mill's expenses, and the amounts were then deducted from the debt owed by Volpe-Vito to Mill.  (Govt. Ex. 5, Ex. 18 pp. 3632, 3652)  In January 2002, Volpe-Vito transferred real property to Mill in exchange for a reduction of Volpe-Vito's debt to Mill, but no formal appraisal was done to value the property.  (Govt. Ex. 5, Ex. 3)  In 2002 Volpe-Vito paid off its mortgage with NBD using funds from a mortgage with Warren bank on which Volpe-Vito and Mill were co-borrowers.  (Govt. Ex. 4, pp. 72-74; Govt. Ex. 5, Ex. 3)

25.  Four Bears Water Park stopped operating in 2004 and all of Flab's assets were transferred to Volpe-Vito without dissolving Flab.  (Govt. Ex. 4, p. 35; Govt. Ex. 5, p. 43)  3000 Auburn, the real property on which the Four Bears Water Park was located, is now being developed into residential property.  (Govt. Ex. 5, p. 35)  Mill's office was recently re-located to 3000 Auburn.  (Govt. Ex. 5, pp. 35-36)  Mill does not currently hold title to any of the real property identified in the Plaintiffs' Amended Complaint.  (Govt. Ex. 7 ¶ 5)

26.  Melton was formed by Mill, Hikmat Meram, and Mowafak Hermiz in 2003 as a limited liability company, and Mr. Stramaglia became an owner in 2005.  (Pls' Ex. 18)  Mill and Mr. Stramaglia each own 33.33% of Melton.  (Pls' Ex. 18)  Mill transferred at least some of the property it received from Volpe-Vito to Melton.  (Govt. Ex. 5, p. 58)  Melton does not currently hold title to any real property or any other assets.  (L. Stramaglia Deposition, Govt. Ex. 5, p. 61, 63)

## ARGUMENT

### I.  The Burden

The Plaintiffs base their summary judgment motion on their assertion that the United States will not be able to establish an element on which it will bear the burden at trial.  Two of the Plaintiffs, Louis Stramaglia and Volpe-Vito,[2] bring suit pursuant to 26 U.S.C. § 7426.  In such cases, a plaintiff initially bears the burden to show that he had title or some other ownership

---

[2] The only notices of levy that were attached to the Plaintiffs' First Amended Complaint were in the names of Volpe-Vito and Mr. Stramaglia.

-9-

in the property and that the government made a levy on that property because of a tax assessment against another taxpayer.   After such a showing has been made by the plaintiff, the burden <u>then</u> shifts to the government to prove a nexus between the taxpayer and the property levied upon, but this shifting burden does not relieve the plaintiff from the ultimate burden of proving that the levy was wrongful.  <u>See, e.g.</u>, <u>Porta-John of America, Inc. v. United States</u>, 4 F. Supp. 2d 688, 699 (E.D. Mich. 1998).

All four of the Plaintiffs seek to quiet title to property against the United States, pursuant to 28 U.S.C. § 2410.  Under Michigan law, the plaintiffs bear the burden of proof in a quiet title action, and they must make out a prima facie case of good title.  Once a prima facie case is made, the burden then shifts to the defendant to establish a superior right or title to the property. <u>Sumpter v. United States</u>, 302 F. Supp. 2d 707, 719 (E.D. Mich. 2004).  The Plaintiffs have not stated facts in their motion for summary judgment or in their complaint to establish that <u>each</u> of them have an interest in property and therefore their motion for summary judgment on their quiet title and wrongful levy claims must be denied.[3]  Moreover, their motion for summary judgment is insufficient to shift the burden to the United States.[4]

## II.     Volpe-Vito and Mr. Stramaglia are Alter-Egos of Auburn Park and Flab

Even assuming that Volpe-Vito and Mr. Stramaglia can show that they own property, Volpe-Vito and Mr. Stramaglia are the alter egos of the taxpayers, Auburn Park and Flab.

*A.      The United States May Collect Tax Liabilities From the Alter Ego of a Taxpayer*

Under federal tax law, the Internal Revenue Service may collect the tax debts of a taxpayer from the assets of his nominee, instrumentality, or alter ego.  <u>G.M. Leasing Corp. v. United States</u>, 429 U.S. 338, 350-51 (1977).  In addition to the remedy provided by federal law,

---

[3] To the extent that the Plaintiffs seek a declaratory judgment as a separate claim, it must be dismissed.  There is no waiver of sovereign immunity allowing a plaintiff to seek a declaratory judgment against the United States in a case related to federal taxes.  The United States has waived its immunity for quiet title actions through 28 U.S.C. § 2410 and for wrongful levy actions through 26 U.S.C. § 7426(a)(1).  In contrast, the Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides federal court jurisdiction for declaratory judgments "except with respect to Federal taxes . . . ."  The Plaintiffs seek a declaratory judgment that they are not liable for the federal tax liabilities of Auburn Park and Flab.

[4] Even if the Court does reach this issue in considering the Plaintiffs' motion, the evidence thus far adduced by the United States', as described below, at least establishes a genuine issue of material fact for trial.

Michigan law provides that a creditor may collect debts from either an alter ego or a nominee.

The alter ego theory provides that "where [a] corporation is a mere agent or instrumentality of its shareholders or a device to avoid legal obligations, the corporate entity may be ignored." Porta-John of America v. United States, 4 F. Supp. 2d 688, 700 (E.D.Mich. 1998) (citing Kline v. Kline, 305 N.W.297 (Mich. App. 1981)). The corporate veil "may be pierced only when an otherwise separate corporate existence has been used to subvert justice or cause a result that is contrary to some overriding public policy." Servo Kinetics, Inc. v. Tokyo Precision Instruments Co., 475 F.3d 783, 798 (6th Cir. 2007) (quoting Seasword v. Hilti, 449 Mich. 542, 537 N.W.2d 221, 224 (1995)). Generally, "Michigan courts will not pierce the corporate veil unless (1) the corporate entity was a mere instrumentality of another entity or individual; (2) the corporate entity was used to commit a fraud or wrong; and (3) the plaintiff suffered an unjust loss." Id. (citing Foodland Distribs. v. Al-Naimi, 220 Mich.App. 453, 559 N.W.2d 379, 381 (1996)). However, "[i]t has often been held that the interposition of a corporation will not be allowed to defeat a legislative policy, whether that was the aim or only the result of the arrangement." Anderson v. Abbott, 321 U.S. 349, 362-363 (1944). "In determining whether to disregard the corporate form, we must consider the importance of the use of that form in the federal statutory scheme, an inquiry that generally gives less deference to the corporate form than does the strict alter ego doctrine of state law." Hamilton v. Carell, 243 F.3d 992, 1004 (6th Cir. 2001). In an alter-ego case, "[t]he entire spectrum of relevant facts forms the background for such an inquiry, and the facts are to be assessed in light of the corporation's economic justification to determine if the corporate form has been abused." Bodenhamer Bldg. Corp. v. Architectural Research, 873 F.2d 109, 111 (6th Cir. 1989). Moreover, "[e]ach case must be decided on its own facts." Id.

> B.   Auburn Park and Flab were Mere Instrumentalities of Volpe-Vito and Mr. Stramaglia

The Michigan courts consider many factors in determining whether corporate entities are instrumentalities of each other or their shareholders. These factors include undercapitalization of the corporation, the maintenance of separate books, the separation of corporate and individual finances, the use of the corporation to support fraud or illegality, the honoring of corporate formalities, and whether the corporation is merely a sham. Laborers' Pension Trust Fund v. Sidney Weingerger Homes, Inc., 872 F.2d 702, 704-05 (6th Cir. 1988).

-11-

For example, in <u>Herman v. Mobile Homes Corp.</u>, 317 Mich. 233, 26 N.W.2d 757, 760-761 (1947), the court found that two subsidiaries were the alter egos of a parent corporation based on the following circumstances: (1) All of the capital of the two subsidiaries was provided exclusively by the parent company; (2) all of the credit necessary for the operations of the subsidiaries was provided exclusively by the parent company; (3) the subsidiaries purchased all of its supplies from the parent company; (4) the capital of the subsidiaries were grossly inadequate for the nature of the undertaking; (5) the officers and directors of the subsidiaries were the officers and directors of the parent or the family members of the president of the parent; (6) officers and employees of the parent rendered gratuitous services to the subsidiaries in the normal course of business; (7) the parent handled the payroll of the subsidiaries; (8) the policies and decisions of the subsidiaries were determined largely by the president of the parent; (9) the offices and business of all three corporations were carried on at the same business address; (10) one of the subsidiaries received no profit; (11) one of the subsidiaries, which was indebted to the parent, was dissolved, with the debt written off by both companies; (12) correspondence indicated that the advertising manager indicated that the parent considered the subsidiary's construction project as its own; (13) correspondence indicated that the president of the parent considered the subsidiary's construction project as the parent's; (14) the parent responded to correspondence and complaints directed to the subsidiaries; and (15) the parent engaged in the same business as the subsidiaries.

As another example, in <u>Sidney Weinberger Homes</u>, the Sixth Circuit upheld the district court's piercing of the corporate veil to reach the assets of a shareholder where the shareholder "loaned" money to the corporation with no formal agreements, paid expenses of the corporation out of his own pocket, the corporation paid personal expenses of the shareholder, the corporation operated solely for the shareholder's personal benefit, records of various expenses were generally inadequate, and the shareholder withdrew money from the corporate entity when the corporation ended while some creditors were left unpaid.  872 F.2d at 705.

In the present case, the evidence that Auburn Park and Flab were alter egos of Volpe-Vito and Mr. Stramaglia is overwhelming.

1.      <u>Volpe-Vito, Auburn Park, and Flab Were Instrumentalities of Each Other</u>

Although Volpe-Vito, Auburn Park, and Flab tended to handle different aspects of the

business, all three were simply parts of Four Bears Water Park, which was operated as a single business enterprise.  Volpe-Vito owned the assets, Auburn Park was responsible for the operations of the park other than the food service, and Flab operated the food service.  Indeed, in his deposition, Mr. Nepa, the bookkeeper for all three companies, repeatedly demonstrated his view that the companies were all part of a single business.  He described Flab as the "restaurant portion" of Four Bears Water Park.  (Govt. Ex. 5, p. 11) In explaining why Auburn Park would transfer money to Volpe-Vito to pay property taxes and mortgage payments, he stated that "Auburn Park was handling the funds of the operations."  (Id. p. 26) Similarly, he stated that Auburn Park later became responsible for paying Volpe-Vito's property taxes "since they were handling the revenue."  (Id. p. 30) In addition, Auburn Park "handled the revenues" from renting out the parking lot for Four Bears Water Park, which was owned by Volpe-Vito and located across the street from 3000 Auburn.  (Id. p. 85) When asked how much time Mr. Stramaglia spent working for Volpe-Vito versus Auburn Park, Mr. Nepa stated that "the companies are at the same office.  So I mean you can't justify how much time in each company." (Id. p. 40.)

Mr. Stramaglia also made some statements in his deposition indicating that the companies were all part of the same business enterprise.  He stated that during the time that Auburn Park was responsible for the operations of Four Bears Water Park, "really, Volpe-Vito didn't have any business to speak of.  They became the landowner, you know.  I mean they owned the land, they owned certain equipment that was put into the park when it was built and it first ran the park.  Basically, that was it."  (Govt. Ex. 4, pp. 22-23) In explaining why Auburn Park became a guarantor for Volpe-Vito's mortgage, he stated that the bank wanted "to make sure that the mortgage got paid . . . that Auburn Park didn't take all the money of the income from the park operations and do something else with it."  (Id. p. 28) With respect to Flab, he stated that "it kind of got dumped on me because we needed the food service.  Then, we tried to get a couple of different food companies to come in to operate it but the business was so erratic that nobody wanted to take a chance and we couldn't do without it." (Id. p. 44)

The way the companies conducted themselves also demonstrates that they were all essentially part of the same business.  Although some factors, such as keeping separate books, financial statements, and bank accounts, are consistent with separate companies, many other factors weigh in favor of a finding that the companies were alter egos.  Officers and employees

-13-

of Auburn Park performed gratuitous services for Volpe-Vito and Flab.  (SOF ¶¶ 7,8, 13, 15)
The officers and owners of Auburn Park and Flab were the same as, or family members of, the
officers and owners of Volpe-Vito.   (SOF ¶¶ 3, 4, 8, 12)

All of the companies' offices were located in the same office on real property owned by
Volpe-Vito.   (SOF ¶¶ 4, 7, 15)  Auburn Park entered into a "Concession Agreement" with
Volpe-Vito by which Auburn Park was given the right to use all of the assets of the water park.
(SOF ¶ 10)  The Concession Agreement was not merely a lease of real property, however.  The
Concession Agreement gave Auburn Park "the right, license, and privilege to operate, manage,
and control the entire Park . . . ."  (Id.) Auburn Park used the real property and equipment owned
by Volpe-Vito.  However, when Volpe-Vito's equipment broke down or wore out, Auburn Park,
not Volpe-Vito, would purchase new equipment.  (SOF ¶ 11)  Auburn Park and Flab were
undercapitalized for the nature of the undertaking. (SOF ¶¶ 7, 9, 10, 13, 21)  Auburn Park was
responsible for paying all of Volpe-Vito's operating expenses.  Meanwhile, Volpe-Vito owned
millions of dollars worth of real property and equipment.  (See Pls' Ex. 5, p. 87)

When Auburn Park failed to pay all of Volpe-Vito's expenses, the Concession
Agreement between Auburn Park and Volpe-Vito was terminated.  (SOF ¶ 13)  Flab's lease
payments were increased from $3,500 per month to $5,000 per month.  (SOF ¶ 7) Years later,
Flab's lease payment was reduced to only $6,000 per year.  (SOF ¶ 7)  This was "because
business was starting to get slower and slower. . . .  We couldn't justify charging $5,000 a month
for the whole year."  (SOF ¶ 7)  The reduction of the lease payment based on Flab's ability to
pay demonstrates that the lease between Flab and Volpe-Vito was not at arms length.

The three companies engaged in numerous "loans" between them, but did not enter into
formal loan agreements, and thus there were no payment terms or interest charged.  (SOF ¶¶ 17
18, 20)  Without these terms there is no business purpose for the lender company, because there
is no potential for making a profit.  Auburn Park simply wrote off large amounts of the debt
owed by Flab as "uncollectible."  (SOF ¶ 21)  All of the credit extended to Auburn Park and Flab
for operations flowed either through Volpe-Vito or Mr. Stramaglia.  (SOF ¶¶ 18, 21)

The three companies paid each other's expenses directly.  (SOF ¶¶ 17, 20)  The amounts
of these expenses would be reflected as a loan payable or account payable on the debtor
company's books and an account receivable or loan receivable on the lender company's books,

-14-

which would be balanced out at the end of the fiscal year.  (SOF ¶ 21)  This method of recording the various loans and payments of expenses demonstrates that these transactions were not at arms length.

Moreover, when Auburn Park and Flab stopped operating, whatever assets they had acquired were simply transferred to Volpe-Vito, and Auburn Park's debt to Volpe-Vito was reduced by the book value of the equipment.  (SOF ¶¶ 14, 25)  After Auburn Park's and Flab's assets were transferred to Volpe-Vito, Volpe-Vito's depreciation schedule for 2005 listed park equipment as acquired in the 1990's, the years when Auburn Park was operating Four Bears Water Park, and restaurant equipment as acquired in the 1980's and 1990's, the years when Flab was operating the Honey Bears Restaurant.  (SOF ¶ 21; Govt. Ex. 4, Ex. 17 pp. 3430-3431)

Moreover, there was often confusion within the companies about which payments and revenues belonged to which company.  Revenues would be deposited in the various entities' bank accounts.  On numerous occasions it was determined that the revenues deposited in one company's bank account were attributable to one of the other companies.  Mr. Nepa would then go back and reflect the deposit as a loan on the books of both companies.  (SOF ¶¶ 17, 20)

The companies also held themselves out to creditors as a single business enterprise. Vendors often submitted invoices addressed to "Four Bears Water Park" when the expenses were for park equipment purchased by Auburn Park or restaurant equipment purchased by Flab.  (SOF ¶¶ 21)  Likewise, both Volpe-Vito and Auburn Park used letterhead that simply identified "Four Bears Water Park."  (SOF ¶ 21)  "Four Bears Water Park" has been the assumed name of Volpe-Vito since 1983.  (SOF ¶ 6)  Indeed, on several occasions creditors garnished Volpe-Vito's bank account for expenses incurred in operating Four Bears Water Park.  (SOF ¶ 19) Creditors also garnished Auburn Park's bank account for expenses incurred in operating the Honey Bears Restaurant and Flab's bank account for expenses incurred in operating the Four Bears Water Park.  (SOF ¶¶ 20)

## 2. Volpe-Vito, Auburn Park, and Flab Were All Instrumentalities of Mr. Stramaglia

Volpe-Vito, Auburn Park, and Flab were all part of the same business, which was controlled by Mr. Stramaglia to such an extent that the three companies were all his instrumentalities.  Mr. Stramaglia was the sole shareholder and president of both Volpe-Vito and Auburn Park and an officer and the main decisionmaker for Flab.  (SOF ¶¶ 3,4, 8, 12)  During

-15-

the summer months, when the Four Bears Water Park was open for business, Mr. Stramaglia was there twelve hours per day, seven days per week.  (SOF ¶ 13)  However, he was not paid a salary or other compensation for his time by any of the companies and he did not keep track of his time.  (SOF ¶¶ 8, 13, 15)

When Auburn Park or Flab needed money to continue operating, he either loaned his own personal funds to them directly, loaned money to Volpe-Vito to loan to Auburn Park, or transferred funds between companies.  (SOF ¶¶ 18, 22)  On occasion he mortgaged property personally owned by him, or property owned by Volpe-Vito, to provide funds to continue operating the business.  (SOF ¶¶ 18) The promissory note between Volpe-Vito and Mr. Stramaglia did not provide for a line of credit.  (SOF ¶ 3; Pls' Ex. 4 p. 26)  Nevertheless, the amounts loaned to Volpe-Vito by Mr. Stramaglia were simply added on to the total outstanding debt.  Mr. Stramaglia repeatedly paid expenses of Volpe-Vito, Auburn Park, and Flab out of his own pocket, and the companies paid Mr. Stramaglia's personal expenses.  (SOF ¶¶ 22, 23)  These payments were treated as loans although there were no notes or loan agreements between Mr. Stramaglia and Auburn Park or Flab.  (SOF ¶¶ 22)

Despite the lack of these terms, between 1998 and 2002, Auburn Park paid off the debt owed to Mr. Stramaglia.  (SOF ¶¶ 22)  Also during this time Auburn Park paid down the debt owed to Volpe-Vito, of which Mr. Stramaglia was sole shareholder and president.  Similarly, during this period Flab made payments on its $400,000-plus debt to Auburn Park, of which Mr. Stramaglia was also sole shareholder and president.  Thus, Mr. Stramaglia and the creditors controlled by Mr. Stramaglia were paid while federal tax liabilities were unpaid and accruing.

Moreover, when the Four Bears Water Park ceased operating, Volpe-Vito transferred property to Mr. Stramaglia and Mill, also wholly owned and controlled by Mr. Stramaglia.  (SOF ¶¶ 114, 119)  These property transfers were used to offset debts owed by Volpe-Vito to Mr. Stramaglia and Mill.  (Id.)  Again, debts owed to Mr. Stramaglia and companies controlled by Mr. Stramaglia were paid while the federal tax liabilities remained unpaid.

C.    *Auburn Park's and Flab's Use of the Corporate Veil to Avoid Paying Federal Tax Liabilities is a Wrong*

Using the corporate form to avoid paying federal tax liabilities is sufficient to satisfy the second prong of the Servo Kinetics analysis.  Notably, the standard does not, contrary to the

-16-

Plaintiffs' assertions, require that a corporate entity be created for the purpose of committing a fraud or wrong, only that it be <u>used</u> to commit one. "The traditional basis for piercing the corporate veil has been to protect a corporation's creditors where there is a unity of interest of the stockholders and the corporation and where the stockholders <u>have used the corporate structure in an attempt to avoid legal obligations</u>." <u>Foodland Distributors</u>, 220 Mich. App. at 456 (emphasis added). Moreover, "fraudulent or wrongful conduct may be inferred from other evidence." <u>Id.</u> In <u>Servo Kinetics</u> itself, the court held that breach of a contract was a sufficient wrong to justify piercing the corporate veil where the claimant did not voluntarily contract with an undercapitalized subsidiary. 475 F.3d at 799-800. Moreover, in <u>Grass Lake All Seasons Resort v. United States</u>, No. 01-CV-74386, 2005 U.S. Dist. LEXIS 22448 (E.D. Mich. Aug. 29, 2005) (Pls' Ex. 19), the only case relied upon by the Plaintiffs that involves federal tax liabilities, the court held that using the corporate form to avoid the payment of tax liabilities was a sufficient wrong to pierce the corporate veil. <u>Id.</u> at *46-48.

 The Plaintiffs' reliance on such cases as <u>Gledhill v. Fisher & Co.</u>, 272 Mich. 353, 262 N.W. 371 (1935) and <u>Chrysler Corp. v. Ford Motor Co.</u>, 972, F. Supp. 1097 (E.D. Mich. 1997) is misplaced. The holding of <u>Gledhill v. Fisher & Co.</u>, 272 Mich. 353, 262 N.W. 371 (1935), on which the Plaintiffs rely, was expressly distinguished and limited in <u>Herman v. Mobile Homes Corp.</u>, 317 Mich. 233, 26 N.W.2d 757, 761-762 (1947) ("The fact situation in <u>Gledhill v. Fisher & Co.</u>, supra, was far different from that in the instant case."). In <u>Gledhill</u>, the court found that the subsidiary's capital was sufficient at the time it entered into a sale with the plaintiff, and that it was only the unforeseen circumstance of the Great Depression that caused the sale to become undersecured. 262 N.W. at 373. In other words, the subsidiary was not undercapitalized. While it is true that forming a corporation "for the avowed purpose of avoiding personal responsibility," <u>id.</u> at 373, is permissible, "[a]n obvious inadequacy of capital, measured by the nature and magnitude of the corporate undertaking, has frequently been an important factor in cases denying stockholders their defense of limited liability." <u>Anderson v. Abbott</u>, 321 U.S. 349, 362 (1944). Thus an important factor was missing in <u>Gledhill</u>.

 In addition, <u>Chrysler Corp</u>. is inapplicable here. At issue in that case were liabilities for environmental cleanup pursuant to CERCLA, 42 U.S.C. § 9601 <u>et seq.</u>, that arose years after the parent company polluted and the alleged alter ego companies had intermingled their affairs. The

court's holding that the relationship between the companies was not for a wrongful purpose was not only based on the legitimate purposes for creating the subsidiary; during the time that the parent and subsidiary were allegedly alter egos, the environmental liabilities did not exist.  972 F. Supp. at 1107.  The corporate relationship therefore could not have been used to avoid legal obligations that were not in existence either at the time the subsidiary was formed or while both companies were in existence and interacting.  Indeed, the court specifically noted that "[m]ost significantly, there was no contemporaneous impairment of the rights of any creditors."  Id. Where the liabilities, such as federal employment tax liabilities, come into existence and accrue at the same time that two companies are acting as alter egos, Chrysler Corp. is simply inapplicable.

Here, the circumstances are sufficient to satisfy the second prong of Servo Kinetics.  The operations of Four Bears Water Park were originally handled by Volpe-Vito, a corporation with $300,000 in capital stock and millions of dollars worth of real property and equipment.  (SOF ¶ 3; Pls' Ex. 5 p. 87)  The operations, and corresponding liabilities, were then transferred to Auburn Park, a corporation with only $1000 in capital stock and no fixed assets.  (SOF ¶¶ 9,11)  This transfer was done purposely to separate the assets of the business from the liabilities, specifically to insulate the real property from potential injury claims that had been causing losses every year.  (SOF ¶ 9)  Shortly after formation, with only $1,000 in capital, Auburn Park entered into a "Concession Agreement" which obligated it in the amount of $200,000 plus 10% of sales and the cost of insurance.  (SOF ¶ 10)  Although Auburn Park paid the federal tax liabilities from 1992 to 1994, it suddenly stopped.  While these liabilities were accruing, Auburn Park engaged in numerous "loans" with Volpe-Vito and Flab that did not conform to ordinary corporate formalities, paid expenses for Volpe-Vito and Flab, paid thousands of dollars worth of personal expenses for Mr. Stramaglia as "loan repayment," and purchased an investment account.  This arrangement directly benefitted Volpe-Vito by allowing it to maintain equity in the real property, which it has now been developing into residential property, and benefitted Mr. Stramaglia, who through his control of the company was able to ensure that the liabilities Auburn Park owed to him were repaid.  In the meantime, the tax liabilities remain unpaid.

Flab was also used in avoiding the payment of federal employment tax liabilities, and therefore this is sufficient to satisfy the second prong of the Servo Kinetics analysis for Flab as

-18-

well.  Flab was formed with only $5000 in capital stock, and immediately entered into a lease with Volpe-Vito that obligated it for $3500 per month, later increased to $5000 per month.  As the years went on and tax liabilities started to accrue, Flab paid expenses for Auburn Park and Volpe-Vito, repaid loans owed to Auburn Park, Volpe-Vito, and Mr. Stramaglia, and borrowed funds to pay some of its expenses, but not the tax liabilities.

        D.     *The United States has Suffered an Unjust Loss*

The third prong of <u>Servo Kinetics</u>, that the creditor suffer an unjust loss, is also satisfied.  As described above, employment tax liabilities were incurred by Auburn Park and Flab, and these liabilities remain unpaid.  During the time that the liabilities were accruing, Auburn Park and Flab made payments on debts owed to Mr. Stramaglia, Volpe-Vito, and Mill.  Auburn Park also purchased an investment account during this time.  Thus, there were funds available to pay the tax liabilities at the time they were accruing.  However, Mr. Stramaglia ensured that he and the companies he controlled were paid first.  In such circumstances, the loss suffered by the United States is unjust.  (<u>See</u> <u>Grass Lake</u>, Pls' Ex. 19 at *46.)

Because Auburn Park and Flab were the instrumentalities of Volpe-Vito and Mr. Stramaglia, Auburn Park and Flab were used to avoid paying federal tax liabilities, and the United States has suffered an unjust loss, Volpe-Vito and Mr. Stramaglia must be found to be the alter egos of Auburn Park and Flab.

**III.    The Plaintiffs Are Nominees or Transferees**

As described above, Volpe-Vito and Mr. Stramaglia are alter-egos of Auburn Park and Flab.  If the Plaintiffs are able to demonstrate that Mill and Melton do own property, then Mill and Melton hold that property as nominees for Volpe-Vito and/or Mr. Stramaglia, and, by extension, Auburn Park and Flab.[5]  Moreover, even if the Court finds that Volpe-Vito was not the alter ego of Auburn Park and Flab, the above analysis at least demonstrates that Volpe-Vito held 3000 Auburn as a nominee for Auburn Park and Flab.  Importantly, the Plaintiffs have not moved for summary judgment on the nominee issue.

In order to establish that property is held by a nominee, the Court must consider six factors:  (1) whether inadequate or no consideration was paid by the nominee;  (2) whether the

---

[5] Mill may also be the alter ego of Volpe-Vito, and/or Auburn Park and Flab.  (<u>See</u> SOF ¶¶ 16, 24, 25)

-19-

property was placed in the nominee's name in anticipation of a lawsuit or other liability while the transferor remains in control of the property;  (3) whether there is a close relationship between the nominee and the transferor;  (4) whether they failed to record the conveyance;  (5) whether the transferor retains possession;  and (6) whether the transferor continues to enjoy the benefits of the transferred property.  Porta-John, 4 F. Supp. 2d at 701.

In this case, Volpe-Vito transferred part of the property that was used in the Four Bears Water Park business to Mill.  (SOF ¶ 24)  Mill, in turn, apparently transferred this property to Melton, who sold it to other persons and entities.  The property was transferred to Mill for a reduction in debt, although no formal appraisal was done for the property to establish the value. (SOF ¶ 24) The transfer occurred after the tax liabilities had accrued.  Volpe-Vito and Mill are both solely owned by Mr. Stramaglia, and he is president of both companies.  The offices of both companies are located at 3000 Auburn.  (SOF ¶ 25)  Mill and Mr. Stramaglia together own 66.6% of Melton.  (SOF ¶ 26)  Because Mill is an owner of Melton, Mill continues to enjoy the profits from the ultimate sales of the property to third parties by Melton.  Likewise, Volpe-Vito and Mr. Stramaglia continue to enjoy the benefits of the properties.  Thus, if Mill and Melton can establish that they hold titles to property, then that property is held as nominees for Volpe-Vito, Mr. Stramaglia, Auburn Park, and/or Flab.

## CONCLUSION

For the foregoing reasons, the Plaintiffs' motion for summary judgment should be denied.

Respectfully submitted,

STEPHEN J. MURPHY
United States Attorney

*/s/ Christine S. Hooks*
CHRISTINE S. HOOKS
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 55
Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 514-6060
Fax: (202) 514-5238
Email: Christine.S.Hooks@usdoj.gov

20

CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that, this 9th day of October, 2007, the foregoing United States' Opposition to Plaintiffs' Motion for Summary Judgment has been filed electronically with the Clerk of Court using the CM/ECF System.  Notice of this filing will be sent by e-mail to all parties registered to received electronic notification.

*/s/ Christine S. Hooks*
CHRISTINE S. HOOKS
Trial Attorney, Tax Division

-21-